BRIDGET SULLIVAN, administratrix, *vs.* BOSTON ELECTRIC
LIGHT COMPANY.

Suffolk.     March 11, 1902. — May 19, 1902.

Present: HOLMES, C. J., KNOWLTON, MORTON, HAMMOND, & LORING, JJ.

*Negligence*, In building in process of construction. *Practice, Civil*, Order of trial,
Exceptions.

In an action under St. 1898, c. 565, for the death of the plaintiff's intestate caused
by the falling of the roof of an engine room, owned and to be operated by the
defendant and then in process of construction, it appeared, that the roof con-
sisted of steel trusses then partly covered with terra cotta, that these trusses
rested on steel columns, that the columns gave way, bending inward and causing
the accident, that the columns were to have been enclosed in brick work, but
that this only partly had been done, so that the brick wall was about ten feet short
of two steel runway girders one on each side of the room, supporting a steel
crane with a movable hoist which extended from one side of the room to the
other, that the crane was worked by electricity, lifted fifteen tons, and itself
weighed forty-eight tons, that it was furnished by the same contractor that
made the steel work of the roof, that the crane was to be ready for use before
the completion of the building, and that one of the uses to be made of it was in
hoisting and moving various heavy articles needed to complete and equip the
building, that the steel work was done, except some connecting pieces that could
not be put in until the brick work was more complete, that the plaintiff's intes-
tate was at work in the employ of a contractor doing the mason work, that the
crane was not under the control of the plaintiff's employer and its operator
was not in his employ. There was evidence that the crane was used to move
stones for the engine foundations not a part of the work of that contractor, and
in moving machinery and steam pipes not shown to be covered by any contract
with an independent contractor, and the defendant offered no explanation as
to how it happened that the crane which it had caused to be placed in posi-
tion was used for these various purposes. *Held*, that the jury were warranted
in finding that the accident was due in part to the operation of the crane before
the steel work had been strengthened by the brick wall, that the crane was so
operated by the defendant, and that this was negligence.

An action under St. 1898, c. 565, for the death of the plaintiff's intestate caused
by the falling of the roof of an engine room, owned and to be operated by the
defendant and then in process of construction, was tried at the same time with
an action by the same plaintiff for the same death against the steel company
which made the steel trusses of the roof that fell and also made the steel col-
umns that failed to support the trusses. At the close of the plaintiff's evidence,
the defendant owner elected to rest on the plaintiff's case and put in no evi-
dence. The judge refused to order a verdict for the defendant owner, and also
refused to allow him to go to the jury immediately and before the defendant
steel company had put in its evidence in the other case, and the steel company
proceeded to introduce evidence tending to show that it was not liable and to
cast the liability on the owner. At the conclusion of the evidence, the argu-

ments in both cases were made, and the judge submitted both cases to the jury, instructing them, that as against the defendant owner they could consider no evidence introduced after he rested his case. *The* jury found against the defendant owner. *Held*, that, the questions, whether the cases should be tried together, and at what stage of the trial the case of the resting defendant should be submitted to the jury, were within the discretion of the presiding judge, and that, if the defendant owner was prejudiced, his only remedy was by a motion for a new trial.

Where two cases were tried together and the judge left it to the jury to say whether certain plans had been introduced against both of the defendants or only against one of them, when probably he ought to have decided that question for himself, this will not sustain an exception, if it nowhere appears that the plans contained anything prejudicial to the objecting defendant.

TORT under St. 1898, c. 565, for the death of the plaintiff's husband and intestate caused by the falling of the roof of a power house of the defendant, at the corner of L Street and East First Street in that part of Boston called South Boston, while the intestate was working there in the employ of Whidden and Company, independent contractors for the mason work of the power house.    Writ dated October 11, 1898.

In the Superior Court before *Richardson*, J., the case, in accordance with a previous order, was tried at the same time with another case by the same plaintiff against the Pennsylvania Steel Company, contractor for the steel work of the roof, in which it was sought to make that company liable for the death of the intestate.    At the time of the accident, the plaintiff was working in a trench in that part of the building which when completed was to be used as the engine room.    The crane afterwards mentioned was furnished by the Pennsylvania Steel Company under a contract with the defendant.

All the steel in this building and roof which had been furnished or erected before the accident was furnished and erected by the Pennsylvania Steel Company under the provisions of its contract with the defendant.    The furnishing and erecting of the electric crane, so far as it had been done, was done by the Pennsylvania Steel Company, under the same contract.    All the brick work and mason work which had up to that time been furnished and erected had been so furnished and erected by Whidden and Company under a separate and independent contract with the defendant, whereby the brick walls were to be built by them at a fixed price per cubic foot, and the other mason work

connected with the building was to be done at fixed prices. The terra cotta tiling and covering of the roof (outside of the steel framework of the roof), so far as they had been made or put on at the time of the accident, were made and put on by one McIntosh.

The building in question, which was in process of construction upon the land of the defendant, was nearly square, and, when completed, would have consisted of a steel framework, brick walls, and a roof composed of a framework of steel trusses connected by steel purlines. Upon these purlines the terra cotta tiling and the roof covering were to be set and held in place. The building was designed to be divided into two portions, an engine room and a boiler room, with a subdivision of the latter for use as a coal pocket. The engine room was about two hundred and forty feet long by eighty feet wide, and from sixty to sixty-five feet in height. The boiler room, including the coal pocket, was practically of the same size as the engine room, making the entire structure about two hundred and forty feet long by about one hundred and sixty feet in width, and from sixty to sixty-five feet in height. The roofers began their work near the centre of the roof framework, or skeleton, and at the time of the accident, July 29, 1898, had covered at least one half of it.

At the time of the accident part of the roof, consisting of six or seven trusses over the engine room at the easterly or water end of the building, with whatever tiling or roofing material had been placed thereon, fell to the ground. These trusses were supported by steel columns, and fell when the columns gave way. The three columns supporting the three trusses nearest the easterly or water end of the building "buckled" or bent over and fell inward pointing toward the fourth column, and so did the three columns supporting the three trusses to the west of the fourth truss.

Each of the steel trusses of the roof of the engine room was supported at each end by, and rested upon, a steel column, the trusses over the engine room being supported at one end by a row of steel columns on the L Street side of the building, and at the other end by a row of steel columns which divided the engine room from the boiler room, the rows of steel columns running parallel with each other. These columns and trusses had

been in position for three or four weeks before the accident, and all the purlines connecting the trusses with each other had been attached and erected in place, except the purlines which were to be connected with the wall at the easterly or water end of the building when the wall should have reached the height of the trusses. This set or bay of purlines had not been erected in place or attached at the time of the accident, and were a part of the steel work contracted for to be furnished and erected by the Pennsylvania Steel Company under the contract mentioned. This set or bay of purlines was to fit into the wall of masonry at the easterly or water end of the building, and there were no steel columns in that wall. The purlines could not be attached until the wall was up. At the date of the accident that easterly wall was from eighteen to twenty-five feet in height, or about twenty-five feet below the crane girder.

After the erection of the steel columns, Whidden and Company, contractors for the brick work, began to build the walls outside of and surrounding these steel columns, and at the time of the accident, the L Street or northerly wall had been built from thirty-five or forty feet high or to within nine or ten feet of the crane runway girder hereafter described, which was from about forty-five to fifty feet from the ground, except that in the last three bays or spaces between the columns at the easterly or water end of the building, the wall was lower, tapering off to a minimum height of about twenty-five feet from the ground. Part of the centre wall, or that dividing the engine room from the boiler room, had been built to a height about five feet above the crane runway girder, and the remainder of the wall had been built to the height of the runway girder, except that in the last three bays or spaces between the columns on the easterly end of the building it was lower, tapering off toward the easterly or water end to a minimum height of about twenty-five feet. The wall of the easterly or water end had been built to about eighteen to twenty-five feet in height, and that at the westerly end of the building had reached about thirty feet in height. The purlines on the most easterly bay were designed to rest one end on top of the easterly wall, when completed, and the other end on the first truss, there being no truss on top of the easterly wall.

In the engine room there were two crane runway girders, one

on each side of the room resting on and fastened to a shoulder of the steel columns. These girders ran the entire length of the engine room and were ·from about forty-five to fifty feet from the ground. Upon the top of these runway girders there was a rail or track upon which to run an electric crane. This crane extended from side to side, spanning the engine room, one end resting upon the girder on the L Street side, and the other resting upon the girder on the columns dividing the engine room from the boiler room. Upon the top of this crane there was a movable hoist which ran on the top of the crane from one side of the engine room to the other, the crane itself moving from one end of the engine room to the other. The whole apparatus was operated by electricity and was put in for hoisting purposes. The crane lifted fifteen tons and was designed to lift and carry weights of from one to twenty-five tons. The crane itself weighed forty-eight tons. It was built and furnished by the Morgan Engineering Company under a sub-contract of that company with the Pennsylvania Steel Company.

It appeared, that the crane had been operated for moving or hoisting foundation stones, machinery, big steam pipes, flagging and things connected with the engine at times between July 18 and 26, 1898, but it did not appear under whose direction or control it was operated on any of these occasions unless it could be inferred from the evidence stated. It did appear, however, that the crane was in no way under the control of Whidden, and that the operator of the crane was not in the employ of Whidden.

While the building was in the above described condition, on July 29, 1898, at or about six o'clock in the afternoon, a part of the roof, consisting of six or seven trusses over the engine room, collapsed and fell with a crash into the interior of the engine room, killing the plaintiff's intestate.*

At the close of the plaintiff's case, the defendant asked the judge to direct a verdict for the defendant upon the plaintiff's case, and, upon the judge's statement that the motion would not be considered at that stage unless the defendant also rested its case, the defendant elected to rest and did rest, and introduced no evidence in its own behalf, and thereupon requested the judge

---

* For a further description of the same building at a time later than the accident in this case, see *Melvin* v. *Pennsylvania Steel Co.* 180 Mass. 196.

to rule that upon all the evidence the plaintiff could not recover. The defendant further requested the judge to rule that, in case the judge should rule that the plaintiff was entitled to go to the jury, the defendant had the right to have the case presented to the jury immediately and before the introduction of any evidence for the defence in the other case, against the Pennsylvania Steel Company, in which the counsel for the defendant did not elect to rest his case upon the conclusion of the plaintiff's case.

The judge refused to make either of the rulings so requested, and ruled that the case should be submitted to the jury. The judge did not allow the defendant to argue the case to the jury upon the evidence as it then stood at the conclusion of the plaintiff's case, but having refused the requests to rule, allowed the case against the Pennsylvania Steel Company to proceed before the same jury and allowed the Pennsylvania Steel Company, the defendant in the other case, before argument by the defendant in this case, to put in the defence of the steel company, wherein testimony was introduced on behalf of the steel company, without cross-examination on the part of the defendant in this case, which tended, or was contended to tend, to relieve the steel company from liability and to cast the liability upon the defendant in this case. As to the evidence so introduced by the steel company, the judge expressly charged the jury to disregard the evidence introduced on behalf of the steel company after the plaintiff and defendant had rested in the case at bar, and instructed them that the liability of the defendant in the case at bar should be determined by the state of evidence as it existed when the plaintiff and defendant rested in the case at bar.

After the closing of the plaintiff's case in the case at bar, the counsel for the defendant remained in attendance, awaiting an opportunity to make his final argument before the jury in behalf of the defendant, but took no part in the examination of witnesses.

Upon the conclusion of both cases, they were submitted to the jury at the same time, the presiding judge instructing the jury that they were to consider as evidence against the defendant in this case only such evidence as had been introduced

before it rested and only such evidence as was in the case at the conclusion of the plaintiff's case against this defendant. The jury, however, heard the entire evidence presented by the steel company in its case, which consumed nearly an entire day after the defendant had rested in the case at bar. The defendant excepted to the order of the judge allowing this method of procedure by which evidence in another case against a different defendant was heard by the same jury before the final argument for the defendant in the case at bar.

The defendant requested the judge to make the following rulings, which were given or refused as indicated:

1. Upon all the evidence in this case the plaintiff is not entitled to recover against this defendant. [Refused.]

2. In deciding the case of the Boston Electric Light Company, the jury must decide it upon the evidence in that case, as it stood at the time both the parties to it rested. All evidence afterwards introduced in the case of the Pennsylvania Steel Company must be wholly disregarded in the decision of the case against the electric light company. [Given.]

3. The plans which were put in evidence at the time the contract between the two defendants was offered were admitted as evidence in the case against the steel company only. Not having been admitted as against the electric light company, they must be wholly disregarded in the decision of the case against the latter company. [Refused, and substitute given.]

4. If the building which fell was being constructed by different contractors for the electric light company and not by the company itself, and the work of the contractors was not finished and the building was not completed when the accident occurred, the electric light company is not liable. [Given with a modification.]

5. Upon the evidence in this case, the building was being erected by independent contractors, for whose negligence the electric light company is not liable. [Refused.]

6. The building not being completed at the time of the accident, and there being no evidence in this case that it had been turned over to and accepted by the electric light company, the fall of the roof is not in itself evidence of negligence on the part of the electric light company. [Given in substance.]

7. Under the circumstances stated in the last ruling (6), the fall of the roof was in itself evidence of negligence on the part of the contractor for the steel work. [Refused.]

8. The mere fact that the electric light company had an engineer or architect on the ground for the purpose of overseeing the work in its behalf, and seeing that the contractors did their work according to the contracts, would not make the electric light company liable in this case or relieve any contractor from liability. [Given with a supplement.]

9. Upon the evidence, the employment of Mr. Ball [the engineer of the defendant] and the duties performed by him are not such as to make the electric light company liable and to relieve any contractor from liability. [Refused, and substitute given.]

10. The burden of proof is upon the plaintiff to prove, and not upon the electric light company to disprove, the material elements of the case, including:

(1) That the building had been completed, or so far completed as to enable the contractors to turn it over to the electric light company, and had been accepted by and taken into the custody and control of the latter. [Given.]

(2) That Mr. Ball's employment, position and relation to the work were such that they relieved the contractors of liability and shifted the responsibility for the building upon the electric light company. [Refused.]

(3) That the fall of the roof was occasioned by any act or default of the electric light company. If the jury are in doubt as to what caused the roof to fall, or as to whether it fell through any act or neglect of the electric light company, a verdict cannot be rendered against the latter. [Given.]

11. There is no evidence that the steel work contracted for by the Pennsylvania Steel Company had in fact been fully completed or had been accepted by this defendant. [Refused, but later given in substance in answers to suggestions of counsel at the close of the judge's charge, the judge then stating that the purlines had not been put up at the east end of the building where the wall was not high enough to set them.]

12. If such steel work had just been completed and had been turned over to this defendant, and the roof fell because of hidden

defects in the material or of the use of defective materials by the steel company, or of defective or negligent construction, the defendant would not be liable. [Given.]

As to the third request, the judge instructed the jury as follows: " Those plans which were put in evidence at the time the contract between the two defendants was offered, if they were admitted as evidence in the case against the steel company, should not be considered by you as against the Boston Electric Light Company; and if they were not admitted against the electric light company they must be wholly disregarded in the consideration of the case against the latter company."

The fourth request was given in the following form: " If the building which fell was being constructed by different contractors for the electric light company and not by the company itself, and the work of the contractors was not finished and the building was not completed when the accident occurred, and no agent or servant of the electric light company was directing or controlling, or had any direction and control over, any construction work, or operations there, then the electric light company, so far as I see, under the law could not be. held."

In lieu of the sixth request, the judge instructed the jury as follows: " The fall of the roof is not in itself evidence of negligence on the part of the electric light company, or of the other defendant. The mere fact that the roof fell is not sufficient to charge anybody. That is, the plaintiff does not make out a case by showing that a person was injured or a man was killed. He must go further."

As supplementary to the eighth request, the judge instructed the jury as follows: " If all Mr. Ball had to do was to say whether the work was done according to contract, and exercised no direction about it how it should be done and when it should be done, or what should be done now and then, and interfered only so far as to approve or disapprove of work done, passing his judgment upon it, whether it was done under the contract or not, if that is all he did I instruct you that that would not be such an interference on behalf of the owner as to make the owner liable."

As to the ninth request, the presiding judge ruled that the questions therein referred to were for the jury, and further

instructed the jury as follows: " What Mr. Ball did, what he undertook to do, whether he interfered or not, whether he gave any directions or exercised any control of the work of the crane or of the building of the roof, or gave directions as to the construction of the walls, or anything, — that is a question entirely for you."

The jury returned a verdict for the plaintiff in the sum of $5,000; and the defendant alleged exceptions.

*C. A. Snow*, for the defendant.

*J. E. Cotter*, (*B. R. Doody* with him,) for the plaintiff.

HAMMOND, J.   The immediate cause of the fall of the roof was the " buckling" or bending of several steel columns at the easterly end of the northerly wall of the engine room.   Although the evidence as to the cause of this bending was vague and rather unsatisfactory, still it would warrant a finding in accordance with the testimony of the only expert witness called by the plaintiff, that the bending was due in part to the jar and strain caused by the operation of the crane before the brick wall which was to encase and strengthen the steel columns had been carried to a sufficient height; and that the operation of the crane under the circumstances was a negligent act.

At the trial it was contended by the defendant that, even if this was true, still the evidence failed to show that the crane was operated by the defendant or by any one for whose acts it was answerable, the ground of the contention being that the work upon the building was all being done under independent contractors over whom the defendant had no control.   And the real question on this part of the case is whether or not the evidence was sufficient to warrant a finding that the crane was operated by the defendant.

The land was owned by the defendant and the building was being erected thereon by its procurement, and when completed was to be used by the defendant in its own business.   In the absence of any explanation of the relation between the actual workers upon the building and the defendant, these facts of themselves would justify a finding that they were its agents and servants.   It appeared however that there were several independent contractors upon the work, the Pennsylvania Steel Company, which had a contract covering the crane and all the

other steel work; Whidden, by whom all the brick and mason work was to be done; and perhaps McIntosh, who put on the terra cotta and other roof material. It further appeared that the engine foundation stones were to be furnished by the Cape Ann Granite Company and set by Whidden, but the nature of the contract with the Cape Ann company did not directly further appear. There was no evidence of any other independent contractors.

The crane was in position, and on several days before the accident was operated " for moving or hoisting foundation stones, machinery, big steam pipes, flagging and things connected with the engine, . . . but it did not appear under whose direction or control it was operated on any of these occasions unless it can be inferred from the evidence stated " in the bill of exceptions. " It did appear, however, that the crane was in no way under the control of Whidden, and that the operator of the crane was not in [his] employ."

Whidden testified that during the time the crane was thus in operation " the stone on one of the engine foundations had been set, and one stone on the second foundation . . .; that is, one whole foundation had been set and part of another." He also testified that the stones were brought into the building by the " granite man," who furnished them ; and when asked what means were used for bringing the stones into the building and putting them into position where he could set them replied: " They were unloaded from the team by the crane." He further said that he could not tell whether or not the foundation stones which were thus laid before the accident were brought into the building and handled again before the crane was operated. Upon being shown the photograph of the date of July 18, he said that it appeared to him from the photograph " as if there were some of those stones piled down at the base of one of the engine foundations, and that one of the stones there was large enough to be the main foundation stone." It is clear that the jury might properly have concluded that this crane was used to move stones for the engine foundations, and that that work was a part of the contract neither with Whidden nor the granite company. There is nothing to show that the work done by the crane in hoisting or moving the machinery and steam pipes is

covered by any contract with an independent contractor. It is to be noted also, and the fact is admitted by the defendant on its brief, that the crane was to be ready for use before the completion of the building; and it is a fair inference that one of the uses to be made of it was the hoisting and moving of various heavy articles needed to complete and equip the building. It is further to be noted that the defendant declined to offer any explanation as to how it happened that the crane which it had caused to be placed in position was used for these various purposes.

In view of the ownership of the land and building, the purpose for which the latter was being constructed, the provision in the contract between the defendant and the Pennsylvania Steel Company that the crane should be ready some time before even the completion of the steel work, the work to which the crane was put, the fact that the work does not appear to have been covered by any agreement with an independent contractor, and the entire lack of any explanation of the defendant or any offer of evidence whatever on its part to clear up the matter, it is clear that the jury would be warranted in finding that the crane was operated by the defendant, its agents and servants. The first and fifth requests, therefore, were rightly refused.

The jury were instructed that the fall of the roof was not evidence of negligence on the part of the defendant. Whether it was evidence of neglect on the part of the steel company was not material to the case against the defendant.

The case against the defendant and the case against the steel company, which were pending at the same time, arose out of the same accident and were for the same injury. The evidence in each case was very largely the same, and it was within the discretion of the court to order that they be tried together. It was within the discretion of the judge at what time to submit each case to the jury, and we see no error of law in the course taken by the presiding judge. If the course taken was prejudicial to the defendant, the remedy is by motion for a new trial in that court.

Although the evidence as to the connection of Mr. Ball with the work is slight, still we see no error in the way in which the judge dealt with the requests as to his connection with the work.

The presiding judge seems to have left to the jury the question whether certain plans had during the trial been admitted in the case against the defendant, or only in the case against the Pennsylvania Steel Company. Assuming that he should have decided that question for himself, it nowhere appears in the bill of exceptions whether they contained anything prejudicial to the defendant, and hence we cannot see how it was harmed by this method of dealing with the matter.

While the judge declined to give the eleventh request in terms, still, so far as respects the purlines to be placed upon the easterly end of the building, the error, if any there was, seems to have been corrected in the colloquy between him and counsel for the defendant at the close of the charge, and the defendant has no ground for complaint as to this request.

The definition of gross negligence given at the end of the charge was sufficiently favorable to the defendant.

The charge was full and correct, and the case was properly left to the jury under instructions sufficiently favorable to the defendant.

*Exceptions overruled.*